In The Matter of: The Appeal of CHARLES D. OWENS and JOHN F. PADGETT d/b/a FOREST CITY ASSOCIATES from the decision of the Rutherford County Board of Equalization and Review Concerning Property Taxation for 1994

No. COA98-270

(Filed 16 February 1999)

**Taxation— valuation—capitalization rate—findings not sufficient**

A decision of the North Carolina Property Tax Commission appraising certain commercial warehouses was reversed and remanded where the Commission used the income capitalization appraisal method but failed to specify in its final decision the capitalization rate utilized and there was an absence in the record of evidence sustaining the rate apparently employed by the Commission. On remand, the Commission was to rely on the

existing record and hear additional arguments as it deemed appropriate.

Appeal by Rutherford County from the final decision of the North Carolina Property Tax Commission entered 14 November 1997. Heard in the Court of Appeals 22 October 1998.

*County of Rutherford, by County of Rutherford Attorney Laura J. Bridges and Shelley T. Eason, for appellant.*

*J. Thomas Davis, for appellee.*

JOHN, Judge.

Appellant County of Rutherford (the County) appeals a final decision of the North Carolina Property Tax Commission (the Commission) appraising certain commercial warehouses owned by appellees Charles D. Owens, Jr. (Owens), and John F. Padgett (Padgett) (jointly "Taxpayers"). The County argues the Commission erred by: 1) rendering findings of fact, conclusions of law and an order "unsupported by competent, material and substantial evidence in view of the entire record;" 2) denying the County's motion for dismissal at the close of Taxpayers' evidence; and 3) "denying the County's motion for discovery sanctions and in ordering the matter to be heard on its merits." For the reasons set forth herein, we reverse the decision of the Commission.

Relevant facts and procedural history include the following: In 1994, the County conducted a reappraisal and reassessment of Taxpayers' small industrial park in Rutherford County. Taxpayers appealed the County's assessment to the Rutherford County Board of Equalization and Review which affirmed the County's appraisal. On 20 October 1994, Taxpayers appealed to the Property Tax Commission and filed required Applications for Hearing 21 November 1994.

At the 26 September 1997 hearing before the Commission, the primary issue was the valuation of nine (9) parcels (the property) in Taxpayers' industrial park upon each of which had been constructed a prefabricated metal warehouse. Taxpayers leased the warehouses to commercial tenants at a rate of approximately $1.50 per square foot per month.

Taxpayers maintained to the Commission that the County's values were too high because they were based upon "replacement cost

**IN RE APPEAL OF OWENS**

[132 N.C. App. 281 (1999)]

and the income approach," and that a more accurate valuation would be "what it had cost [the Taxpayers] to build" the buildings. The income approach was inappropriate, Taxpayers continued, because sales of highly comparable properties in Rutherford County were lacking, thus precluding determination of a proper capitalization rate for use of the income approach of appraisal. Finally, Taxpayers concluded, no reasonable person would purchase the property at the County's values because the maximum rent obtainable would not produce sufficient income to justify such a purchase, *i.e.*, unimproved property could be purchased and identical new buildings placed thereon for a sum less than the County's valuation of the property.

The County conceded direct comparable sales evidence was lacking and that the comparable sales approach to valuation "was given the least amount of consideration." Instead, it was the County's position that the property "highly lend[s itself] to a cost approach methodology but [should be] adjusted through the income approach." In its final analysis, and "in reconciling [the] valuation estimate, [the County] placed most emphasis on the income approach because of the nature of the property" as income producing.

In applying the income approach of valuation, the County

capitalize[d the] buildings based upon mortgage equity capitalization principles which [is a yield capitalization method and] takes into consideration typical financing of buildings.

Specifically, County expert witness Charles Long (Long) stated:

We use a 75 percent loan to value ratio with 25 percent of the balance. The equity position that the—the investor will assume will be their portion at a 12 percent equity yield rate. . . . This is also based on a typical 25-year term at eight and one-quarter percent borrowing rate. And again, one other component to consider in that rate is a 10-year holding period, which is the typical amount of time the investor would hold that building before considering a sale. When you take those elements into consideration, that gives a basis of ten and a half percent (10.5%) for a capitalization rate. Then we added, based on the age of the—of the building . . . twenty-five one-hundredths of a percent for each age that the building exists. So a brand new building will be ten and a half percent (10.5%), a two to three-year old building 10.75 percent, and then adding one-quarter of one percent for each two years of age that a building existed.

IN RE APPEAL OF OWENS

[132 N.C. App. 281 (1999)]

Long further testified on cross-examination as follows:

Q: And that equity capitalization rate requires comparable sales, doesn't it, to determine?

A: You can—you can determine that equity capitalization rate through comparable sales and that must be highly comparable. . . . They are not required; however, they can be proven in the marketplace as to what the equity yield is. And you can get that information just from lending practices.

Q: Well, are you familiar with what is termed the American Institute of Real Estate Appraisers [and their textbook, The Appraisal of Real Estate]?

A: That's correct.

. . . .

Q: Doesn't it say in the volume that I have—that equity capitalization rates are derived from comparable sales by dividing the pretax—pretax cash flow of each sale by the equity invested?

A: That is what that says in that section, that's correct.

Q: Now, you've already testified though that you had a lack of comparable sales in regard to this type property, isn't that correct?

A: That's correct.

Q: So your capital rate would be distorted in regard to whatever means that you used to get those comparable sales necessary to capitalize—to make your capitalization rate?

A: No, the information that we used was secondary information; and those equity capitalization rates were derived using comparable sales.

Q: . . . That means [the information] came from other areas other than Rutherford County, isn't that correct?

A: That's correct.

On 14 November 1997, the Commission announced its final written decision, providing in relevant part that:

5. The County's appraisal of [Taxpayers'] properties substantially exceeded the true value in money of the properties as of January 1, 1994.

**IN RE APPEAL OF OWENS**

[132 N.C. App. 281 (1999)]

6. Of the three appraisal methods recognized by the Commission, cost approach, comparable sales approach, and income approach, the Commission finds that no probative evidence was offered regarding the comparable sales and cost approaches. Even though the Commission considered all three of the appraisal methods, the Commission relied on the income approach to determine the values of the subject properties.

7. Under the income approach method, the value of property is determined by dividing the net income by an appropriate capitalization rate. The Taxpayer presented evidence showing the monthly rental income regarding each of the subject properties. . . . After accepting the Taxpayer's income as market income and adjusting the annual gross income of the properties for expenses and vacancy, the resulting net income was capitalized into an indication of market value for each of the subject properties.

The following table reflects the Commission's final appraisal of the nine parcels, as well as the corresponding values asserted by Taxpayers and the County.

| Bldg # | Tax Parcel # | Square Footage | Annual Rent in Dollars | County Value in Dollars | Taxpayer Value in Dollars | Commission Value in Dollars |
|---|---|---|---|---|---|---|
| 23 | 245-1-1H | 60,000 | 90,000.00 | 580,700.00 | 441,000.00 | 450,000.00 |
| 5 | 245-1-55 | 30,000 | 42.999.96 | 254,700.00 | 190,000.00 | 215,000.00 |
| 14 | 245-1-68 | 30,000 | 37,500.00 | 272,300.00 | 190,000.00 | 187,560.00 |
| 2 | 245-1-69 | 20,000 | 24,999.96 | 156,200.00 | 120,000.00 | 125,000.00 |
| 3 | 245-1-71 | 20,000 | 24,999.96 | 166,200.00 | 120,000.00 | 125,000.00 |
| 4 | 245-1-71A | 25,000 | 37,500.00 | 201,900.00 | 151,900.00 | 187,560.00 |
| 17 | 245-1-1F | 30,000 | 45,000.00 | 296,600.00 | 210,000.00 | 225,000.00 |
| 15 | 245-1-1E | 67,500 | 84,375.00 | 614,000.00 | 420,470.00 | 421,867.00 |
| 15A | 245-1-2C | 25,000 | 30,000.00 | 231,500.00 | 155,730.00 | 187,560.00 |

The County timely appealed to this Court 11 December 1997. On appeal, the County in the main asserts that its

substantial rights . . . have been prejudiced because the Commission's findings, inferences, conclusions or decisions are . . . [u]nsupported by competent, material and substantial evidence in view of the entire record as submitted.

We conclude the County's argument has merit.

Our review of a final decision of the Commission is governed by N.C.G.S. § 105-345.2(b) (1997), which states:

(b) So far as necessary to the decision and where presented, the court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

Upon challenge to a decision of the Commission under subsection (5) above, we are to review the "whole record." N.C.G.S. § 105-345.2(c) (1997); *see also Mao/Pines Assoc. v. New Hanover Bd. of Equalization*, 116 N.C. App. 551, 556, 449 S.E.2d 196, 199 (1994). The "whole record" test is not a tool of judicial intrusion; "instead, it merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *In re Rogers*, 297 N.C. 48, 65, 253 S.E.2d 912, 922 (1979).

In addition, certain other principles apply: (1) a reviewing court is neither free to weigh the evidence presented to the Commission nor to substitute its own evaluation of the evidence for that of the Commission; (2) *ad valorem* tax assessments are presumed to be correct; and (3) "the correctness of tax assessments, the good faith of tax assessors and the validity of their actions are presumed." *In re McElwee*, 304 N.C. 68, 75, 283 S.E.2d 115, 120 (1981).

The General Assembly requires all property in this State be appraised for *ad valorem* tax purposes in accordance with N.C.G.S. § 105-283 (1997) which provides in pertinent part:

[a]ll property . . . shall as far as practicable be appraised or valued at its true value in money. When used in this Subchapter, the

**IN RE APPEAL OF OWENS**

[132 N.C. App. 281 (1999)]

words, "true value" shall be interpreted as meaning market value, that is, the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used.

Under N.C.G.S. § 105-317(a) (1997), the following specific factors are to be considered in arriving at "true value":

Whenever any real property is appraised it shall be the duty of the persons making appraisals:

. . . .

(2) In determining the true value of a building or other improvement, to consider at least its location; type of construction; age; replacement cost; cost; adaptability for residence, commercial, industrial, or other uses; past income; probable future income; and any other factors that may affect its value.

The County contends it complied with the foregoing provisions in employing an income approach to the valuation of the property. We have previously commented "the income approach is the most reliable method in reaching the market value of investment property." *In re Appeal of Belk-Broome Co.*, 119 N.C. App. 470, 474, 458 S.E.2d 921, 924, *aff'd*, 342 N.C. 890, 467 S.E.2d 242 (1996). "The income approach to value is based on the principle that something is worth what it will earn." *In re Southern Railway*, 313 N.C. 177, 185, 328 S.E.2d 235, 241 (1985).

The capitalized value of a given income stream varies directly with the amount of income and inversely with the capitalization rate . . . and [s]light variations in the capitalization rate can result in large variations in value.

*Id.*

The parties agree that there are two principal income capitalization appraisal methods—direct capitalization and yield capitalization. Indeed, both parties cite and rely upon a textbook produced by the Institute of Appraisers, *The Appraisal of Real Estate*. Although not binding upon this Court, this source summarizes the two methods of capitalization as follows:

Direct capitalization is . . . used to convert an estimate of a single year's income expectancy, or an annual average of several years' income expectancies, into an indication of value in one direct step—either by dividing the income estimate by an appropriate income rate or by multiplying the income estimate by an appropriate factor. . . . The rate or factor selected represents the relationship between income and value observed in the market and is derived through comparable sales analysis.

. . . .

Yield capitalization is . . . used to convert future benefits to present value by discounting each future benefit at an appropriate yield rate or by developing an overall rate that explicitly reflects the investment's income pattern, value change, and yield rate. . . . The method is profit-or yield-oriented, simulating typical investor assumptions with formulas that calculate the present value of expected benefits assuming specified profit or yield requirements.

. . . .

Direct capitalization is simple and easily understood. The capitalization rate or factor is derived directly from the market. . . . Yield capitalization, on the other hand, tends to be complex, requiring the use of special tables, calculators, or computer programs [and the] formulas and factors [used] can be obtained from financial tables. . . .

According to the testimony of Long, the County utilized a mortgage-equity capitalization approach, a variety of yield capitalization, to value the property. In the absence of evidence of direct comparable sales within Rutherford County, the County determined the capitalization rate by looking to "the marketplace as to what the equity yield [was]. And [the County derived] that information just from lending practices." The only comparable sales information was from areas outside Rutherford County and was "secondary information," and not "highly comparable." Ultimately, the County established the appropriate capitalization rate as being between ten and one-half percent (10.5%) and twelve and three-quarters percent (12.75%), depending upon the age of the warehouse.

Taxpayers did not address an appropriate capitalization rate in their evidence in view of their contention that valuation should

IN RE APPEAL OF OWENS

[132 N.C. App. 281 (1999)]

be based upon the cost of constructing the improvements on the property.

In its final decision, the Commission indicated it valued the property by "dividing the net income by an appropriate capitalization rate." The Commission thus relied upon the direct capitalization method, *see Appraisal of Real Estate*, rather than the yield capitalization approach employed by the County or the cost approach advocated by Taxpayers. However, the Commission's final decision fails to disclose the specific capitalization rate it utilized. Moreover, review of the "whole record," *see* G.S. § 105-345.2(c), does not reveal any evidence supporting the ultimate capitalization rate apparently employed by the Commission.

Taxpayers maintain the Commission's capitalization rate may be determined mathematically by dividing the annual income produced by a particular parcel into the corresponding appraisal value assigned to that parcel by the Commission. Such calculations suggest a twenty percent (20%) rate was utilized by the Commission. Notwithstanding, "[i]t is difficult, if not impossible, for an appellate court to divine the decision making process of an administrative agency unless the agency clearly sets it out in its order." *Southern Railway*, 313 N.C. at 183, 328 S.E.2d at 240.

Taxpayers respond by pointing to the testimony of Padgett who noted Taxpayers sought an annual gross return of twenty-one percent (21%) on their investment, and who expressed the opinion that an investor would require a similar return if purchasing the property. However, as stated in Taxpayers' brief:

[Under the direct capitalization approach], the capitalization rate or factor is derived directly from the market and no distinction is made between return on and return of capital. Direct capitalization does not explain value in terms of *specific investor assumptions*.

*Appraisal of Real Estate* (emphasis added).

Significantly, the capitalization rate under the direct capitalization approach is "derived through comparable sales analysis," *see id.*, and both the County and Taxpayers acknowledge that "highly comparable" sales information was lacking in the instant case. Moreover, the Commission found that "no probative evidence was offered regarding the comparable sales and cost approaches." Accordingly, we cannot "divine the decision making process" of the Commission,

*Southern Railway,* 313 N.C. at 183, 328 S.E.2d at 240, in particular its choice of an "appropriate" capitalization rate, nor may we substitute our own "evaluation of the evidence for that of the [Commission]." *McElwee,* 304 N.C. at 75, 283 S.E.2d at 120.

We therefore uphold the County's argument that the Commission's findings are unsupported by "competent, material and substantial evidence in view of the entire record," G.S. § 105-345.2(b)(5), in view of its failure to specify in its final decision the "appropriate" capitalization rate utilized, and in view of the absence in the record of evidence sustaining the rate apparently employed by the Commission. Accordingly, the final decision of the Commission is reversed and this matter remanded to the Commission for entry of a new final decision containing findings of fact supported by evidence in the record. On remand, the Commission shall rely upon the existing record and hear additional arguments as it deems appropriate. *See* G.S. § 105-345.2(b) ("court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings"); *see also Brock v. Tax Commission,* 290 N.C. 731, 737, 228 S.E.2d 254, 258 (1976) (where Commission's findings are not supported by competent, material and substantial evidence, "the case will be remanded for further proceedings").

Prior to conclusion, we note the County also argues that the Commission erred in denying the County's motion for dismissal at the close of Taxpayers' evidence, and that the Commission abused its discretion by failing to impose sanctions and hearing Taxpayers' appeal on the merits in light of Taxpayers' willful failure to comply with a discovery order. Suffice it to state we have carefully reviewed the record and determined these contentions are unfounded.

Reversed and remanded.

Judges GREENE and McGEE concur.